**CHARLES WOODSON**, SBN 258791
Law Office of Charles Woodson
725 Washington Street
Oakland, California 94607
Telephone: (510) 302-8780
Facsimile: (510) 288-0444
Email: cwoodson@cjswlaw.com

Attorney for Defendant
**LANCE GREEN**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>Plaintiff,<br><br>vs.<br><br>**LANCE GREEN**,<br><br>Defendant. | Case No. CR 20-74-CW<br><br>**DEFENDANT LANCE GREEN'S SENTENCING MEMORANDUM**<br><br>Hearing Date: May 19, 2020<br>Time: 2:00 p.m.<br>Telephonic Appearance<br>Hon. Claudia Wilken, U.S. District Judge |

## INTRODUCTION

Defendant Lance Green, by and through his counsel, respectfully submits the following sentencing memorandum in support of his request that he be sentenced to home confinement. The basis for the request is that Mr. Green has Type II diabetes (*see* PSR ¶ 60), and placing Mr. Green in the custody and care of the Bureau of Prisons may place him in grave danger due to the COVID-19 pandemic.[1]

---

1. As of May 10, 2020, Santa Rita Jail has 15 positive cases of COVID-19. https://www.alamedacountysheriff.org/admin_covid19.php last visited on May 11, 2020. *Babu v. County of Alameda, et al.*, 18-cr-07677-NC has revealed Santa Rita Jail has failed to control the spread of COVID-19.

# BACKGROUND

1. **Procedural Background**

On October 24, 2019, Probation filed a Form 12 alleging Mr. Green committed a new offense on October 21, 2019 when he was arrested for possessing a firearm and driving under the influence of a car. *USA v. Toussaint*, *et al.* ("*Toussaint*") 12-cr-00407-CW-3, Dkt. No. 262. On November 4, 2019 Mr. Green, out of custody, appeared before Magistrate Ryu and the Government moved for detention but Mr. Green was not remanded into the custody of the Marshals. *Toussaint* Dkt. No. 264. On November 7, 2019 Mr. Green, again out of custody, appeared before Magistrate Ryu, the government again argued for Mr. Green's detention but Mr. Green was not remanded into the custody of the Marshals. *Toussaint* Dkt. No. 266. On November 12, 2019 Mr. Green, again out of custody, appeared before Magistrate Ryu and, following arguments from the parties, he was remanded into the custody of the Marshals. *Toussaint* Dkt. No. 267.

On February 14, 2020 the Government filed an information alleging Mr. Green violated title 18, United States Code section 922(g)(1), for the same conduct that is alleged in the form 12. *USA v. Green* ("*Green*"), 20-cr-00074-CW-1, Dkt. No. 1; PSR ¶ 1. On February 18, 2020 Mr. Green appeared in District Court, waived his right to a hearing on the Form 12 and admitted he violated count one. *Green* Dkt. No. 6; PSR ¶ 3. The Form 12 lists Mr. Green's violation as a Grade B, Criminal History IV, guideline range of 12-18 months.[2] *Toussaint* Dkt. No. 262. Also, Mr. Green waived his right to be indicted in *Green* and plead guilty, pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure written plea to count one of the information. PSR ¶ 3. The parties agreed the sentence imposed be concurrent with a sentence imposed on a form 12 violation. *Id*. However, Probation has recommended Mr. Green be sentence to 41 months in custody to run consecutive to any sentence imposed in *Toussaint*, to be followed by 3 years of supervised release.

---

2. Probation has recommended Mr. Green serve 12 months in custody to be followed by 24 months of supervised release.

2. **Rationale Supporting Mr. Green's Sentencing Recommendation**

   a. **Overview**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). "Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (internal quotations and citations omitted).

This Court has broad discretion to fashion Mr. Green's sentence. When evaluating the balance between punishment and rehabilitation, Mr. Green requests the Court keep in mind that he has come a long way from the 27 year old who first came before this very judge in 2012. Consistent with *Booker*, this Court stands as the arbiter of a just and proper sentence, empowered and required to "make an individualized assessment" of a just sentence pursuant to the factors presented in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007); *see U.S. v. Booker*, 543 U.S. 220 (2005). The Supreme Court's "post-*Booker* opinions make clear that, although a sentencing court must give respectful consideration to the guidelines, *Booker* permits the [C]ourt to tailor the sentence in light of other statutory concerns as well." *Pepper*, 131 S.Ct. at 1241 (quotation and citation omitted); *U.S. v. Booker*, 543 U.S. 220 (2005). Consequently, "'although the Guidelines should be the starting point and the initial bench mark,' district courts may impose sentences within the statutory limits based on appropriate consideration of all the factors listed in [18 U.S.C.] § 3553(a), subject to appellate review for 'reasonableness.'" *Id.*, *quoting Gall*, 552 U.S. at 49-51.

The Court has the responsibility to "impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing, including to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment; to afford adequate deterrence; and to protect the public from further crimes of the defendant." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks and citation omitted) (emphases added); *see also* 18 U.S.C. § 3553(a).

**b. Section 3553(a) Factors**

Section 3553 (a)(1) requires the court to evaluate "[t]he nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

### i. The History and Characteristics of Lance Green

Mr. Green was born in San Jose, California and spent most of his childhood in the Bay Area. PSR ¶¶ 44-47. However, Mr. Green also lived in Montgomery, Alabama during his high school years. PSR ¶ 48. Mr. Green was primarily raised by his mother, Chayrisse Lipscomb, and maternal grandmother; although when his mother was incarcerated for 3 years, Mr. Green lived with his step-father. PSR ¶ 46. Mr. Green's father, Lance Green, Sr., was always part of his life and supportive even though Mr. Green did not have consistent contact him. PSR ¶ 47. Mr. Green and Mr. Green, Sr. believed Ms. Lipscomb interfered with their relationship. PSR ¶ 47, 50.

### ii. Adverse Childhood

Throughout Mr. Green's childhood, his mother dealt with mental and emotional conditions. PSR ¶ 48. Both Mr. Green and Mr. Green Sr. described Ms. Lipscomb as being abusive, verbally and physically, toward Mr. Green. PSR ¶48-50. Mr. Green was physically beaten with a hand, belt, or whatever was available. PSR ¶ 48. Due to the financial constraints, Mr. Green grew up in an environment where he was responsible for a lot of household duties/burdens. PSR ¶¶ 48-49. Due to the volatility and stress at home, Mr. Green had a lot of peer-social difficulties at school. PSR ¶ 49.

### iii. Education and Vocational Skills

Though Mr. Green did not graduate from high school, Mr. Green earned his GED in December of 2012. PSR ¶¶ 50, 69, 70. While in custody, Mr. Green availed himself of several programs offered by BOP:

> How an Auto Engine Works (December 17, 2017); Parenting (July 6, 2017); United States History (October 9, 2014); Spinning (August 14, 2014); Drug Education (February 21, 2014); How to be a Responsible Father: A Workbook for Offenders (December 6, 2013); Coping with Stress (July 2013 to August 2013); Strong Abs & Back (July 2013 to August 2013); and Sports Injury Prevention (July 2013 to August 2013).

PSR ¶ 71. Additionally, he received specialized training and skills as a forklift and machine operator which he acquired during the course of his employment. PSR ¶ 72. He also earned hazardous materials certification and he indicated he received specialized training in the areas of media art, computer arts and photography. *Id*.

      iv.  <u>Substance Abuse</u>

Another byproduct of the volatility and stress at home led to Mr. Green turning to drugs and alcohol. PSR ¶ 66. Mr. Green began using marijuana when he was in his teens and Mr. Green turned to cocaine not long after he started using marijuana. *Id*. Though Mr. Green stopped using drugs, Mr. Green was under the influence of alcohol when he was found in possession of a firearm in this case. PSR ¶¶ 4, 66-68. Since his release from custody in 2018, Mr. Green has not had a dirty drug test. Mr. Green has been clean since 2012. PSR ¶ 68; *See also*, *Toussaint*, PSR ¶ 71. Nevertheless, substance abuse continues to be a relevant factor in the commission of this offense.

      v.  <u>Health and Medical Conditions</u>

In 2012, Mr. Green reported in his presentence report that he had experienced depression. *Toussaint*, PSR ¶ 70. Upon release from the BOP, Mr. Green participated in counseling at Pathway Society in Santa Clara and his counselor indicated Mr. Green was being honest, making progress, and was moving in a positive direction. PSR ¶¶ 63-65. Mr. Green had to discontinue counseling sessions when he had to move, through no fault of his own, from Santa Clara county to Alameda county. Mr. Green reports that when he moved to Alameda county he was not able to participate at counseling sessions at Pathway Society. While having not yet been diagnosed with post-traumatic syndrome disorder, Mr. Green likely suffers from PTSD from events during his childhood and from being the victim of a violent crime in 2008 and 2010. PSR ¶¶ 62, 63.

In addition to being a gunshot victim on two separate occasions, in 2018 Mr. Green lost half of his right hand's middle finger in a work-related accident. PSR ¶ 61. The severity of the injury, which required surgery, was compounded by Mr. Green's diabetes, which significantly slows the healing process. *Id*. Due to Mr. Green's diabetes, the injury was life threatening.

In 2016, Mr. Green was diagnosed with Type II diabetes, for which he receives insulin injections. Exhibit A; PSR ¶ 60. According to the CDC, Mr. Green is at a higher risk for severe

illness due to his diabetes.[3] Since going into custody in November of 2019 at Santa Rita Jail, Mr. Green, Mr. Green's Family, and Mr. Green's counsel have had to lobby the officials at the jail to provide him with insulin. Unfortunately, Santa Rita Jail has a history of providing poor medical treatment for inmates.[4] As the Court is aware, everyone's life has been adversely impacted by COVID-19. General Order 72-2 - 75. Santa Rita Jail continues to have new cases and Mr. Green will almost certainly be repeatedly exposed COVID-19.[5] A similar situation can be found in BOP facilities across the country: as of May 12, 2020 BOP has reported 51 BOP facilities and 23 RRCs have active cases, 50 inmates have died, and Lompoc FCC has more than 900 active cases.[6] According to the statistics, individuals in BOP custody are being infected at a rate more than 6.5 times higher than in the United States.[7] According to the letter submitted to Congress by the Federal Public & Community Defenders on May 11, 2020, the Department of Justice and

---

3. People Who Are At Higher Risk for Severe Illness, found at https://bit.ly/3cv4Ak2

4 Inmates have long suffered inadequate medical care in Santa Rita. Two civil rights class action lawsuits are currently pending in the Northern District of California alleging a lack of adequate medical care, and a third class action alleges a lack of mental health treatment. *See Mohrbacher et al v. Alameda County Sheriff's Office et al*, 18-cv-00050 JD, (N.D. Cal.) (female inmate class action); *Gonzalez et al v. Ahern et al*, 19-cv-07423 JSC, (N.D. Cal.) (male inmate class action); *Babu et al v. Ahern et al*, 18-cv-07677 NC (N.D. Cal.). The complaints in these cases paint a shocking picture of neglect and mistreatment, including inmates receiving no medical attention while undergoing drug detox (*Gonzalez*, Dkt. No. 1 at ¶ 94), inmates being denied lifesaving prescribed medication for weeks (*Id.* at ¶ 93), slow response times to medical emergencies like seizures (*Id.* at ¶ 96), and unanswered requests for medical attention by bed-ridden inmates (*Mohrbacher*, Dkt. No. 103 at ¶ 94). One horrifying example of the result of this inadequate care is inmate Candace Steel: in December 2019, Judge James Donato denied Alameda Sherriff's motion to dismiss Ms. Steel's complaint which alleges that she gave birth to her baby alone, on the ground, in an isolation cell after her screams for medical attention were ignored for hours. *Steel et al. v. Alameda County Sheriff's Office, et al.,*18-cv-05072 JD (N.D. Cal.), Dkt. No. 14.

5. The CDC published an article in its Morbidity and Mortality Weekly Report entitled *COVID-19 Correctional and Detention Facilities - United States, February - April 2020* that "symptom screening alone is inadequate to promptly identify and isolate infected persons in congregate settings such as correctional and detention facilities. Additional strategies, including physical distancing, movement restrictions, use of cloth face coverings, intensified cleaning, infection control training for staff members, and disinfection of high-touch surfaces in shared spaces are recommended to prevent and manage spread within correctional and detention facilities." Found at https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm

6. https://www.bop.gov/coronavirus/

7. https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.5.10.pdf

BOP have made little use of the CARES Act. Exhibit B. For a 35 year old man who is facing a statutory maximum sentence of 10 years, a custodial sentence presents grave concerns.

### vi. Friends and Family Support

Since Mr. Green's release from BOP in 2018, he has worked very hard to develop a healthy relationship with his children. PSR ¶ 56. As noted by Ms. Brittany Callum's letter to the court, Mr. Green plays a very active role in his daughter's life and upbringing. PSR ¶ 54; Exhibit C. Mr. Green's eldest, Halayah, also provides insight into the man Mr. Green has become. PSR ¶ 52; Exhibit D. The letter from Mr. Green's grandmother shows that since his release from prison, he was helping grandmother go to doctor's appointments, obtain her medication, and generally provide familial support. PSR ¶ 56; Exhibit E.

Mr. Green's conduct since release from prison shows he has maintained full time employment. PSR ¶¶ 73- 76. In fact, Mr. Green's work ethic is such that he has a pending job offer with the Eastern European Service Agency. Exhibit F. Mr. Green also has the ability to work through a staffing agency in Fremont, California. Exhibit G. Mr. Green has come a long way from the person who came before the Court in 2012. What is most evident from the letters submitted to the Court is that since Mr. Green finished his prison sentence, he actively engaged in services offered through probation, he did not use drugs, he developed healthy relationships with his children, and he maintained full time employment. Exhibits H, I, J.

### vii. The Nature and Characteristics of the Offense

On October 21, 2019, officers from the California Highway Patrol found Mr. Green in a car that was in park, at a stop sign in Oakland, California. PSR ¶¶ 5-9. The officers approached the car and found Mr. Green sleeping in the front driver's seat. *Id*. The officers tried to wake him but he was unresponsive. *Id*. The officer opened the driver's door, nudged Mr. Green who woke up. Mr. Green turned off the car and the officer noticed a firearm in the driver's side door. *Id*. Mr. Green was respectful to law enforcement and this was not a crime of violence. Mr. Green was charged in state court with gun charges and a DUI. PSR ¶ 36.

3. **A Sufficient Sentence Pursuant to Section 3553(a)(2)**

Section 3553(a)(2) directs the Court to evaluate a sentence sufficient to meet the factors delineated in subsections (A) through (D). The Court should fashion a "sentence sufficient, but

not greater than necessary" to satisfy each of the 3553(a)(2) factors. *Kimbrough*, 552 U.S. at 101. In this case, Mr. Green has been in custody since November 12, 2019. PSR ¶ 4. Under the guidelines, a sentencing range in zone D calls for a minimum term of imprisonment. U.S.S.G. § 5C1.1(f). Due to the pandemic Mr. Green is urging the Court to impose a non-custodial sentencing option such as home-confinement or half-way house[8] so that Mr. Green can isolate himself, practice effective social distancing, and if he because sick, he can immediately seek medical treatment at a hospital.

Mr. Green proposes that he be placed on home confinement (lock down) for 3 months at the residence he was residing at prior to going into custody in November, 2019. This residence was approved by U.S. Probation and is listed as Mr. Green's legal address in the PSR. Mr. Green would be placed on electronic monitoring, either by ankle bracelet or through a mobile phone. Mr. Green would be permitted to leave the residence for medical, legal, and counseling appointments. Mr. Green's father, Lance Green, Sr., would accompany Mr. Green to his medical appointments. Further, Mr. Green's family and support network would provide groceries. After 4 months, Mr. Green would remain on electronic monitoring and he would be permitted to leave the residence for work and to provide childcare, in addition to attending medical, legal, and counseling appointments. During this 6 month period, Mr. Green would be subject to a curfew.

4. **The Court Must Craft a Sentence for Mr. Green**

Sections 3553(a)(3) - (a)(5) requires the Court to consider the types of sentences available statutorily and pursuant to the United States Sentencing Guidelines, as well as the policy statements and amendments issued by the U.S. Sentencing Commission. "In sum, while the statute still requires a court to give respectful consideration to the Guidelines, [] *Booker* "'permits the court to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough*, 552 U.S. at 101 (citations omitted). PSR ¶¶ 79-93.

Statutorily, the parties agree. Count one of the indictment carries a maximum penalty of 10 years in prison. PSR ¶ 80. Mr. Green agrees the base offense level is 20, pursuant to USSG §2K2.1(a)(4)(A), because he has one prior crime of violence / controlled substance offense

---

8. The request would be for the halfway house in San Francisco because the halfway house in Oakland is not accepting people due to the presence of COVID-19.

conviction. Plea Agreement, Dkt. No. 6, ¶ 7(a); PSR ¶ 14. Mr. Green agrees the total offense level is 17. PSR ¶¶ 15-23; Dkt. No. 6, ¶ 7(c). Mr. Green is also in agreement with probation's calculations of his adult convictions for a total score of 6. PSR ¶¶ 26-32. Due to the Government's response in *Toussaint* (*see* Dkt. 311), Mr. Green reserves the right to argue his criminal history score. PSR ¶¶ 33, 34.

5. **BOP Designation**

While Mr. Green desperately hopes the court will not impose additional time in custody at a BOP facility, Mr. Green requests this Court recommend to BOP that he serve his sentence at FCI Mendota. 18 U.S.C. § 3621(a)(4). Such a designation is appropriate because FCI Mendota is close to the Bay Area which will allow him to receive visits, after BOP facilities re-open, from his children and family members.

## CONCLUSION

In conclusion, Mr. Green requests that the Court take the foregoing reasons, and any others the Court deems appropriate, into consideration when determining his sentence.

Dated:  May 12, 2020                                     Respectfully submitted,


                                                         *s/ Charles Woodson*
                                                         CHARLES WOODSON
                                                         Counsel for Defendant
                                                         LANCE GREEN