**Pages 1 - 28**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Claudia Wilken, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )        **NO. CR 12-00407-CW**
                                )            **CR 20-00074-CW**
LANCE GREEN,                    )
                                )
            Defendant.          )
_____ )

                        Oakland, California
                        Tuesday, June 16, 2020

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        OFFICE OF THE UNITED STATES ATTORNEY
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  **STEPHEN MEYER**
                        **ASSISTANT UNITED STATES ATTORNEY**

                        OFFICE OF THE UNITED STATES ATTORNEY
                        1301 Clay Street
                        Oakland, CA  94612
                   BY:  **LEAH PAISNER**
                        **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:
                        LAW OFFICES OF CHARLES J.S. WOODSON
                        725 Washington Street, Suite 312
                        Oakland, CA 94607
                   BY:  **CHARLES J.S.  WOODSON, ESQUIRE**

Also Present:           **KAREN MAR,**
                        **UNITED STATES PROBATION**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
              Official Reporter

<u>**Tuesday - June 16, 2020**</u>                                <u>**1:33 P.m.**</u>

**P R O C E E D I N G S**

**---000---**

**THE CLERK:**  We are now calling related criminal cases CR 12-407-CW-3 and CR 20-074-CW, United States vs. Lance Green.

Counsel, please state your appearances for the record.

**MS. PAISNER:**  Good afternoon, Your Honor.  This is Leah Paisner appearing on behalf of the United States.

**MR. WOODSON:**  Good afternoon, Your Honor.  Charles Woodson on behalf of Lance Green, who is on the telephone and in custody at Santa Rita jail.

**THE COURT:**  Mr. Green, are you on the line?

**THE DEFENDANT:**  Yes, Your Honor.

**THE COURT:**  Okay.

**THE PROBATION OFFICER:**  And good afternoon --

**MR. MEYER:**  Good afternoon, Your Honor.  This is Stephen Meyer, also representing the United States.

**THE COURT:**  And who do we have from Probation?

**THE PROBATION OFFICER:**  Your Honor, this is Karen Mar from Probation.

**THE COURT:**  And the court reporter is?

**THE COURT REPORTER:**  Good afternoon, Your Honor.  This is Pam Hebel, court reporter.

**THE COURT:**  First I would like to make sure that the Defendant, Mr. Green, can hear us.  I know we have Mr. Green,

1   Sr., on the line, too, so when I say "Mr. Green," I mean the

2   Defendant, Mr. Green.

3        You can hear us?

4             **THE DEFENDANT:**  Yes, ma'am.

5        **THE COURT:**  If at some point you can't hear us

6   anymore, say something.

7             **THE DEFENDANT:**  Okay.

8        **THE COURT:**  And keep talking until someone can fix it.

9   Not only do you need to mute your phone, but anyone whose phone

10  is not muted at any point needs to not be on a speaker phone;

11  otherwise, we can hear your papers rustling, and it makes it

12  hard to hear what is going on.

13       So, Mr. Green, you have the right to have a sentencing in

14  person.  Your attorney has indicated that you consent to

15  proceed by telephone.  I know it's not ideal, but it's a lot

16  quicker, so I take it you are prepared to go forward today

17  by -- on a telephonic hearing rather than waiting for when we

18  might be able to provide an in-person hearing; am I right?

19            **THE DEFENDANT:**  Correct.

20       **THE COURT:**  Okay.  We have made this telephonic

21  hearing accessible to the public by providing the AT&T phone

22  number and access number on the calendar, so any family

23  members, members of the public, press, etc., could listen in,

24  if they wanted to do so.

25       However, everyone needs to know that there is still a

1    prohibition against recording and rebroadcasting any such

2    proceedings.  So you are not allowed to do that, and if you

3    were to do that, sanctions would be imposed.

4         I have to make a couple of independent findings with

5    respect to the CARES Act, and that is that pursuant to that act

6    and General Order 74 of this court, because of the pandemic

7    emergency of COVID-19, that we can't conduct all of our

8    criminal hearings in person without seriously jeopardizing

9    public health and safety, and, thus, we have resorted to these

10   telephonic remote hearings that we are undertaking.

11        We could, as I mentioned, delay this proceeding, but that,

12   too, would harm the interests of justice because it could cause

13   additional delay and result in the Defendant being detained

14   longer than otherwise necessary.

15        We are not able to hold this particular proceeding by

16   video conference because our video conferencing facilities are

17   of limited availability and difficult to arrange and would

18   again result perhaps in a longer delay before these proceedings

19   could take place.

20        So for those reasons, we're going to proceed as we are at

21   the moment.

22        And I'm going to start by talking about the 2255 case

23   which resulted in setting aside one of Mr. Green's prior

24   convictions under which he was being charged with supervised

25   release violations.  And after some back and forth in the

1  briefs, I think that the upshot is that the most efficient and

2  least complicated method of resolving that would be to simply

3  set aside the conviction and sentence on Count 4 and leave in

4  place the conviction and sentence on Count 3, which was 18

5  months.  There would be credit for time served, and the Court

6  would find that the time has already been served.  And it would

7  be followed by three years of supervised release.

8       While one might -- another option might be to conduct a

9  resentencing on the case as a whole, I think that the method

10  that I've mentioned is the best way to do it, and I think that

11  both sides are in agreement with that.

12       Are they not, Ms. Paisner?

13          **MS. PAISNER:**  Your Honor, I will let AUSA Myers speak

14  to this issue as he is the one who briefed it.  I believe that

15  is correct.

16          **THE COURT:**  Okay.  Mr. Meyer?

17          **MR. MEYER:**  Yes, Your Honor, that is correct.

18          **THE COURT:**  And, Mr. Woodson, you're in agreement with

19  that procedure?

20          **MR. WOODSON:**  Yes, Your Honor.

21          **THE COURT:**  Okay.  So we will simply issue an amended

22  judgment to that effect, and it doesn't -- and then we'll

23  proceed to the new offense and the supervised release violation

24  which -- the latter of which, of course, is premised on the

25  original offense.

1     On the new charge, we have a plea agreement.  It indicates

2     that the Offense Level is 17.  It doesn't take a position on

3     the Criminal History, and provides for a low-end sentence.

4     Probation says the Criminal History is IV, and with an Offense

5     Level of 17 would lead to a Guideline range of 37 to 46 months,

6     of which Probation recommends a sentence of 41 months.

7     The Government is in agreement with the Guideline

8     calculation, but recommends a sentence of 37 months on the new

9     offense, plus -- well, and then later we'll see that they

10    recommend also a 12-month sentence on the new offense, and they

11    recommend that that run concurrent.

12    The Defendant, while not disagreeing with those Guideline

13    calculations, is requesting a home confinement sentence,

14    largely on account of his condition of diabetes and the

15    conditions of coronavirus infection at the Santa Rita jail as

16    well as to any federal prisons to which he might be

17    transferred.

18    And then we have the supervised release violation which is

19    based on the same conduct as the new charge.  The grade of that

20    offense is a B, and the Criminal History is a IV, which would

21    lead to a Guideline range of 12 to 18 months, and Probation is

22    recommending -- I guess I said -- well, strike that.  Probation

23    is recommending what?  Twelve months consecutive on the

24    supervised release violation?

25         **THE PROBATION OFFICER:**  Yes, Your Honor.

1      **THE COURT:**  And the Government, as I mentioned

2   earlier, is recommending 12 months concurrent with the 37

3   months that it recommends on the new offense.  And Defendant

4   again seeks, I guess, a time-served and home confinement

5   sentence.

6      I have a couple of questions.  The Defendant represents

7   that he has diabetes but says that it's Type 2 diabetes but

8   says that he needs to inject insulin.  Type 2 diabetes is not

9   insulin dependent, and you wouldn't be injecting insulin.  I'm

10  not sure if it's Type 1 or Type 2 and if it is requiring -- if

11  he is insulin dependent or not.

12     Counsel, do you know?

13     **MR. WOODSON:**  I do know that he is insulin dependent.

14  Mr. Green can speak directly to that.  Based on the medical

15  records that I've produced to the Court, it appears that he is,

16  in fact, receiving injections at least twice a day.

17     **THE COURT:**  But what's your understanding?

18     Mr. Green, are you Type 1 or Type 2?

19     **THE DEFENDANT:**  It's Type 1 diabetes, but I guess they

20  told me it's going into Type 2 form, but I am insulin

21  dependent, so I would say I'm Type 1.  I know that for a fact.

22  I don't know where the Type 2 came in, but as far as I know for

23  a fact, I am insulin dependent.  I can say that.

24     **THE COURT:**  Yeah.  Okay.

25     So -- and then I read the -- well, I should say I read all

1  parties' sentencing memos, as well as the Probation Officer's

2  memos, but I'm not sure I'm clear on what it is that

3  Mr. Woodson is recommending in terms of home confinement.

4       You're suggesting that he would be on lockdown for three

5  months and then on -- and then it says something about after

6  four months, he would remain on electronic monitoring and would

7  be permitted to leave for work and provide childcare.

8       Did someone just sign in or out?

9       **UNIDENTIFIED SPEAKER:**  Yes, I'm here for -- to -- my

10  has fiancé a court date.  I was given this number to call in.

11       **THE COURT:**  Right.  Who is your fiancé?

12       **UNIDENTIFIED SPEAKER:**  Rafael Mendez.

13       **THE COURT:**  You can turn your phone on mute and wait

14  because we're on another case right now.

15       **UNIDENTIFIED SPEAKER:**  Absolutely.

16       **THE COURT:**  No problem.

17       So what is it you're suggesting, Mr. Woodson?  He first

18  spend three months, leaving only for medical appointments, and

19  then following that, go onto electronic monitoring and spend

20  four months during which he would be allowed to work, and then

21  later it says during the six-month period, he would be subject

22  to a curfew.  So is that the three months plus the four months,

23  which actually I guess is seven months?  Or is that to be seven

24  months followed by another six months?

25       I mean, I'm not necessarily going to do what you ask, but

1    I at least want to know what you are suggesting.

2         **MR. WOODSON:**  What I'm suggesting -- excuse me.

3    Charles Woodson.

4         I understand and apologize for the confusion, Your Honor.

5    My intent was three months of home confinement where he's just

6    on lockdown, and then thereafter, he would be allowed to --

7    after the three months, he would be allowed to leave

8    specific -- just for work, legal.  So that would be the next

9    four months.

10        And then my intention was that he would still be on some

11   type of curfew for an additional six months thereafter, but I

12   wanted to give the Court and give Mr. Green access to just

13   start getting services, specifically for -- possibly for mental

14   health and maybe some other types of counseling, but I wanted

15   the -- essentially I would want some type of transition from

16   complete confinement to freedom, but under the direction of

17   what would essentially be his probation officer.

18        **THE COURT:**  So what you are really talking about is

19   three months plus four months plus six months?

20        **MR. WOODSON:**  Correct.

21        **THE COURT:**  Which would be 13 months.  So that's your

22   proposal?

23        **MR. WOODSON:**  Correct.

24        **THE COURT:**  You also mentioned the possibility of an

25   RRC or residential reentry center, also known as a halfway

1    house.  That is another possibility, although we're having a

2    lot of trouble with bed space in our halfway houses.

3         And I don't know, if Ms. Mar, you're conversant with the

4    current status of the bed state at the RRCs?

5              **THE PROBATION OFFICER:**  I am not, but I know that it's

6    just dependent on whether or not there is any active cases of

7    COVID-19 as well, but I could find out.

8              **THE COURT:**  Well, before we had a case in Oakland so

9    they shut that down.  San Francisco was still open, but there

10   weren't any beds there, but that may not be the case at the

11   moment.

12        But, anyway, let me turn then to Ms. Paisner or Mr. Meyer,

13   whoever wants to address this.  Ordinarily perhaps the

14   Sentencing Guideline range would be appropriate, but given the

15   state of the jails and the prisons with regard to COVID-19 and

16   the fact that diabetes is a comorbidity and leads to, I think,

17   both an increased likelihood of becoming infected as well as

18   increased likelihood of bad outcomes if infected and given the

19   rates of infection that we're seeing at the Bureau of Prisons

20   facilities and the rates of compassionate release motions we're

21   receiving seeking release from people who are already in those

22   prisons that have diabetes and other comorbidities, you didn't

23   mention that problem in your memos, and I wondered what your

24   thought was about that.

25             **MS. PAISNER:**  Your Honor, this is Leah Paisner

speaking.

To address that simply, as of today with respect to Santa Rita, there are only two positive cases of COVID-19. I'm sure Your Honor has seen multiple compassionate release motions at this point laying out the exact procedure Santa Rita is taking to -- as well as BOP facilities are taking to prevent the spread and mitigate the risk posed by COVID-19.

The Government does not dispute that Type 2 -- Type 1 diabetes could be a comorbidity. At the same time by the Defendant's own admission, he is receiving regular care that is appropriate for his condition in custody. And given that the procedures in place have been substantially -- has substantially mitigated the risk and are sufficient to both protecting the Defendant's health while at the same time reducing his risk, I don't believe that should be a grounds for a lower sentence in this case.

THE COURT: Okay. Well, those are my questions. I'm going to hear from the Defense attorney and the Defendant as well, but as long as you're speaking, Ms. Paisner, is there anything you would like to add with respect to your sentencing recommendation?

MS. PAISNER: No, Your Honor, except that in this particular case, as the Court has seen, the Defendant recidivised approximately a year and two months after he was released from custody following his conviction for the

conspiracy to commit armed robbery of a stash house.  At the time of his arrest, he was in a position to endanger the public.  He was intoxicated at the wheel of a vehicle which he left in park but with the engine still running, and he had a loaded firearm in the vehicle next to him within reach.

The fact that the defendant recidivised so quickly after his release indicates to the Government that a sentence of time-served and home confinement with indeterminate conditions about whether he be on location monitoring or not simply is not sufficient to reduce his danger to the community and set him on the path towards rehabilitation once he gets released.

**THE COURT:**  All right.

Ms. Mar, I know you are recommending a custodial sentence, but just hypothetically speaking, if Mr. Green were to be in home confinement, what would be your recommendation as to the safest and most rehabilitative conditions that would be imposed?

You've heard what the Defense attorney recommended.  I don't know if you -- don't mean to put you on the spot since this wasn't part of your recommendation, but if you have any thoughts on the progression that he is proposing or what you would propose, I would be interested to hear.

**THE PROBATION OFFICER:**  Actually, I think that the proposition made by the Defense counsel sounds appropriate. You know, a period of home detention and then gradually moving

1    over to increased ability to go out and receive services would

2    be sufficient.

3        THE COURT:  Did you mention -- had you inspected the

4    place where he had been living most recently?  The memo doesn't

5    say where it was, so if you don't know, we'll ask Mr. Woodson

6    to tell us, but if you're familiar with his most recent

7    approved residence, could you tell us about it?

8        THE PROBATION OFFICER:  I do not have his most recent

9    approved residence.  I know the last place he lived was with

10   his grandmother in Oakland, but I think the last time he wanted

11   to live with his girlfriend.  That was my understanding.

12       THE COURT:  Okay.

13   Well, let me turn to Mr. Woodson.  If you would first tell

14   me what home detention locale you had in mind and then

15   anything else you would like to address with respect to the

16   sentence.

17       MR. WOODSON:  So I was thinking that -- thank you,

18   Your Honor.

19       I was thinking that he would go back to residing where he

20   was residing when he -- this current -- when this case came up,

21   and that's with his grandmother, and I believe that that was --

22   that location had been inspected and was approved, at least

23   back last year when he was living there.  So that would be my

24   proposal, that he live there -- he would reside there.

25       I believe his grandmother is on the line.

1          The other thing I wanted to -- I just kind of wanted to

2     give an overview in terms of reminding the Court that -- well,

3     the Court doesn't need to be reminded.  Mr. Green has come a

4     long way from the individual that came before you back in 2012,

5     and Mr. Green seems to, while he -- when he was out of custody

6     for the 12 months plus the time in his halfway house, we're not

7     seeing him using substances anymore, which was a big deal back

8     in 2012, 2013.  It appears like -- that he's actively turned

9     the corner on illicit substance abuse issues, which is

10    extremely important, and I think it definitely shows growth.

11         The other thing is that his employment -- he was employed

12    once he was released while he was in the halfway house and up

13    until the time of his incarceration, which is a huge change for

14    the individual who came before you back in 2012 with basically

15    no real work record.  We see Mr. Green, after being released,

16    he took to work and he was working very hard.  And he did

17    sustain a serious injury, losing part of his finger.  Given his

18    diabetic condition, recovery is a little more difficult and

19    complicated just due to issues with healing -- the healing

20    process, as Mr. Green had explained to me.

21         And so I think generally speaking, we're seeing somebody

22    with a lot of -- with growth and I think continued growth under

23    some type of guidance.  I note that the pathways with the

24    counseling, I think it was extremely important for him, and I

25    think -- I really believe that, you know, for him receiving

1   those type of services to work through some of the issues that

2   he has and some of the issues that he's gone through are very

3   important.

4        I would note one thing of concern that became apparent to

5   me during our interview with Probation was that he -- I didn't

6   realize he had been shot twice on two separate occasions and

7   any type of -- you know, the injuries that he sustained, the

8   mental issues that revolve around it, his concerns for safety

9   to the extent that he had tried to move out of the Northern

10  District and move back to Alabama where he was living as a high

11  school student, and him feeling dejected because Probation had

12  denied his request, albeit we're not entirely sure why it was

13  rejected.  But the point is that Mr. Green was trying to move

14  in a direction where he would feel safer and where he could

15  continue to work, grow, build his relationship with his

16  children which from the record -- the letters that I received,

17  it shows that he's a very active father regardless of his --

18  the relationship with his -- with the children's mothers, he's

19  clearly engaged, and he clearly spends a lot of his time

20  working on that.

21       I think Mr. Green at this point in time, in addition to

22  the -- you know, the pandemic that's going on, I don't think

23  this request would have been made -- this wouldn't even be a

24  reasonable request six months ago, but given the current

25  conditions and current climate of the country and the globe, I

1    really believe that placing him on home confinement with

2    stringent conditions followed by -- that are to be eased and

3    while they're being eased in terms of the confinement

4    conditions, that he participate in mental health and -- and

5    counseling related to just dealing and processing some of the

6    issues that he is carrying.

7        But I do -- I would like to leave it -- Mr. Green with a

8    little bit of time, just so that he can give the Court a little

9    bit of a better picture about who he is today as opposed to who

10   he was when he first came before the Court.

11           **THE COURT:**  All right.  May I ask if Mr. Green's

12   grandmother is on the line?

13           (No Response.)

14           **THE COURT:**  I guess not.

15           **UNIDENTIFIED SPEAKER:**  Yes.

16           **THE COURT:**  Are you there?

17           **UNIDENTIFIED SPEAKER:**  Yes.

18           **UNIDENTIFIED SPEAKER:**  Yes.  She is on the line.

19           **THE COURT:**  Your name again, ma'am?  Well, it sounds

20   like we don't have too good of a connection.

21           **MS. GREEN:**  Ma'am, hello?  Can you hear -- I'm Lance

22   Green's grandmother.

23           **THE COURT:**  What is your name, ma'am?

24           **MS. GREEN:**  Katherine Green.

25           **THE COURT:**  Katherine Green.  And you are willing at

1  some point to let Mr. Green come back and live with you?

2         **MS. GREEN:**  Yes, I am.

3         **THE COURT:**  Okay.  You can go ahead and mute your

4  phone again.  Sorry.

5      Mr. Green, Sr., are you still there on the line?

6         **MR. GREEN, SR.:**  Yes.

7         **THE COURT:**  The attorney says that you would be

8  willing at some point -- Mr. Green was living under electronic

9  monitoring or in home confinement -- that you would be willing

10  to take him to his medical appointments and supervise him?

11         **MR. GREEN, SR.:**  Yes.

12         **THE COURT:**  Okay.

13      And, Mr. Green, Jr., is there anything you would like to

14  say before sentence is imposed?

15         **THE DEFENDANT:**  Your Honor, I would just like to say

16  for this situation, I don't -- I don't have any excuse for the

17  mistake I made.  It was a selfish mistake.  It's truly an

18  embarrassment; an embarrassment to be here again in front of

19  you and letting down my family and my support system, which I

20  built up.  It's truly -- the situation, you know, it's a

21  letdown and a disappointment for my kids, for all that, you

22  know, I've accumulated over time.

23      You know, the six months plus the 14 months I was out I

24  worked two jobs at some times, being there for my grandmother

25  and building a relationship with my kids, building a

1  relationship with my parents, and being there for family.

2     So the mistake that I made, it just truly was not the best

3  one, but on the road to being better and being great, you know,

4  I made a real mistake, and I think that continuing to work and

5  be there with my family and still depending on my support

6  system, you know, will help.  And I'm hoping that we can find

7  an alternative to the situation to continue me on the correct

8  path.

9     Thank you for your time.

10         **THE COURT:**  All right.

11     Ms. Paisner, did you want to respond to any of this?

12         **MS. PAISNER:**  Your Honor, the one thing I wanted to

13  add to this was that the plea agreement as currently filed

14  contains a Section 3582 waiver.  As the Court knows, the U.S.

15  Attorney's Office is no longer including that provision in the

16  agreement, so I think it would be appropriate to request the

17  Court to strike that line from the plea agreement itself.

18         **THE COURT:**  Oh, okay.  Good.  Thank you for raising

19  that.  I'm not sure how we can strike things in electronic

20  format.  Maybe we better get -- get you to file a revised plea

21  agreement, and it might take a long time to get everyone to

22  sign it, but at least let's have it in writing in the

23  electronic file, if we can't actually edit it.  In the olden

24  days, we used to strike things out and put initials on it, but

25  we can't do that anymore.

1          **MS. PAISNER:**  Understood.

2          **THE COURT:**  I'm also having a little trouble finding a

3    document from Probation that sets out the conditions of

4    supervised release that you would be recommending.  Can you

5    tell me what docket number or what date of report or something

6    so I might be able find that?  Ms. Mar?

7        I've got a revised probation report from June 5th, a

8    presentence report in the 2020 case, and then I've got another

9    presentence report.  Probation office violation memo in the

10   2012 case.  No?

11       Are you still there, Ms. Mar?

12           (No response.)

13          **THE COURT:**  Ms. Mar?

14         **MR. MEYER:**  Sorry, Your Honor.  This is Stephen Meyer.

15       At the end of the revised PSR, in the sentencing

16   recommendation section, there is a section after that that has

17   the conditions -- recommended conditions of supervised release.

18          **THE COURT:**  The June 5th document?

19         **MR. MEYER:**  Yes, Your Honor.

20          **THE COURT:**  Oh, good.  Okay.

21       Did we lose Ms. Mar, though?

22           (No response.)

23          **THE PROBATION OFFICER:**  Hi.  This is Karen Mar for

24   Probation.

25          **THE COURT:**  You're still there.

1          **THE PROBATION OFFICER:**  I got disconnected.

2          **THE COURT:**  Oh, but you're back?

3          **THE PROBATION OFFICER:**  Yes, I'm back.

4          **THE COURT:**  Okay.  Well, what I'm going to do -- and
5     it really is largely because of the coronavirus and the risk of
6     someone in Mr. Green's medical condition.  So I'm going to give
7     a much lower sentence than I otherwise would have.

8          And, Mr. Green, you're getting a break on this, and I hope
9     that you won't take advantage of that, and I hope I won't see
10    you back again and find out that I was wrong.

11         What I am going to do, though, is I am going to impose a
12    sentence of supervised release with conditions of, let's say,
13    nine months in a residential reentry center if there is one
14    that is available that can accommodate Mr. Green's medical
15    issues.  And we'll do that at the discretion of the Probation
16    Office.

17         Ms. Mar, if you could find out what's available and what
18    the conditions would be there in terms of medical care and
19    social distancing and so on and make a decision whether that's
20    feasible.  I think it might well not be, and I'm going to have
21    a backup home detention plan in case it isn't, and that will be
22    essentially what counsel recommends, which is to say the first
23    three months in complete lockdown, other than medical
24    appointments, which could include mental health counseling, by
25    the way, and drug counseling, if that's necessary.

1     And I'll take Mr. Green, Sr., up on his offer to supervise

2  Mr. Green and be with him and make sure that he's going to

3  medical appointments during that first three-month period and

4  isn't going anywhere else on the way there or on the way back.

5     After the first three months, then Mr. Green would be

6  allowed to seek and obtain employment and be released from home

7  detention for purposes of the medical appointments as well as

8  for work if he's able to obtain work or for applications for

9  work.

10     But, Mr. Green, you need to keep your Probation Officer

11  apprised of all of your appointments and work schedules so that

12  if you happen to be found outside the house at some point, your

13  Probation Officer would have known in advance where you were,

14  that you had an appointment for an interview or that you had a

15  work schedule or whatever.

16     And then for six remaining months after that, you'll still

17  be subject to curfew of work, medical appointments, legal

18  appointments, I guess family visits, and other approved

19  activities that Probation is informed of in advance and agrees

20  to.

21     The supervised release will be for -- I've forgotten now

22  what was recommended.

23     **MS. PAISNER:**  Your Honor, it was three years

24  supervised release.  This is Leah Paisner.

25     **THE COURT:**  Thank you, Ms. Paisner.

1      So three years of supervised release.  The first condition

2   will be either the RRC or the home detention at the direction

3   of Probation.  The additional conditions will be the same

4   conditions as in the previous case plus -- well, I guess --

5   what?  We owe Mr. Green a special assessment from the last

6   case?

7               **MR. WOODSON:**  Yes, Your Honor.

8               **THE COURT:**  He already paid, Mr. Woodson?  So we will

9   just apply that to the new case, shall we?

10              **MR. WOODSON:**  I think that's a good idea.

11              **THE COURT:**  I don't think we'll ever see it again any

12  other way.

13      Then we will have a condition of mental health treatment

14  as directed by Probation; a search of residence, vehicle, etc.,

15  by any law enforcement officer with or without any probable

16  cause or suspicion or reasonable suspicion; testing and

17  treatment for alcohol or drug abuse as directed by Probation;

18  abstain from alcoholic beverages.

19      The firearm and ammunition are to be forfeited.

20      I understand you have an explanation for why you felt you

21  needed to have a gun, and maybe that explanation still applies.

22  Maybe you live in a dangerous area, maybe you have Post

23  Traumatic Stress Disorder from previous gunshots, but you can't

24  have a gun regardless of the reasons for it.  You can't have

25  one.  And if you do, somebody's going to get hurt, and at the

1   very least, there won't be anything I can do about a prudent

2   sentence at that point.

3        As far as moving someplace else, the only way you're going

4   to move someplace else is if you are in good standing on

5   supervised release, so if you still have that in mind, what

6   you'd need to do is finish the RRC program, finish the home

7   detention sessions, be in good standing for some length of time

8   because another jurisdiction does not have to take you and they

9   won't take you if they think there is going to be trouble for

10  them.  So that's -- I don't know what happened last time, but

11  if that's part of your plan this time, you need to show some

12  substantial success on supervised release before they're going

13  to consider taking you, and maybe you should do that.  I don't

14  know.

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  Did we have -- let's see.  Did we have --

17  no.  It was just the single count of the supervised release

18  violation.  There is nothing that needs to be dismissed?

19           MS. PAISNER:  No, Your Honor.

20       And just to clarify, Your Honor, for the record, you

21  will -- in case I missed it, the Court is agreeing with

22  Probation's Guideline range calculation but is sentencing the

23  Defendant to essentially a downward departure based on his Type

24  1 -- his proffer regarding Type 1 diabetes and the risk at BOP

25  and Santa Rita facilities?

1    **THE COURT:**  Yes.  Thank you.  All that is true.

2        The Guideline calculations for the new offense and for the

3    supervised release violation -- I don't know if I stated them

4    before, but the ones that Probation laid out I agree with and

5    don't seem to be disputed.

6        And the reason for the downward departure is as, you say,

7    the -- and as I said earlier -- the coronavirus pandemic as

8    well as the particular susceptibility of Mr. Green because of

9    his diabetes condition and the current conditions at Santa

10   Rita, which you say have improved over the past times.  I hope

11   they have and I hope they continue to, but it's still a

12   problem.

13       And what's more, the Bureau of Prisons' prisons to which

14   Mr. Green would be transferred with a sentence of that length,

15   many of them also have serious problems with the infection and

16   with the ability to keep the sort of conditions that are

17   necessary to prevent the spread.  There is problems at Terminal

18   Island, there is problems at Lompoc.  And for those reasons, as

19   well as the support that Mr. Green provided in his sentencing

20   memorandum of family members and community members, which also

21   plays into the decision that a downward departure is

22   appropriate.

23       **UNIDENTIFIED SPEAKER:**  I'm sorry, Judge.  For the 2012

24   case, Charges 2 and 3 need to be dismissed.

25       **THE COURT:**  Okay.

1          **UNIDENTIFIED SPEAKER:**  This is Eric.

2          **THE COURT:**  In which case now?

3          **UNIDENTIFIED SPEAKER:**  In the 2012 case, 12-407,

4     supervised release.

5          **MS. PAISNER:**  Your Honor, I don't believe you formally

6     sentenced the Defendant on the supervised release violations

7     yet.  It's my -- clarify me if I'm wrong, but I believe -- it's

8     my understanding that you were going to proceed to the

9     disposition on the Form 12 after sentencing, and then the

10    Government would move to dismiss those charges.

11         **THE COURT:**  Oh, okay.  So those are in the new

12    supervised release charges?

13         **MS. PAISNER:**  Yes, Your Honor.

14         **THE COURT:**  There is only one set.  Okay.  Yeah.

15         With respect to the supervised release charge, if I didn't

16    say so before, it's a Grade B violation with a Criminal History

17    of IV, Guideline range of 12 to 18 months.  The Government

18    recommends 12 months concurrent with the other sentence, and --

19    but I'm going to impose the same sentence on the supervised

20    release violation as I did on the new offense, which is to say

21    supervised release under the conditions that were specified,

22    and I'll dismiss counts -- what was it?  One and two without

23    prejudice --

24         **MS. PAISNER:**  Two and three, Your Honor.  To

25    clarify -- I apologize.  So it's a sentence of time served, but

1  will there be a tail of supervision to run concurrently with

2  the new term of supervision?

3          **THE COURT:**  Yes.  Yes.

4          **MS. PAISNER:**  Or is -- okay.

5          **THE COURT:**  Yes.  I don't know how much more is left

6  on it.

7          **MS. PAISNER:**  I believe a significant amount is since

8  this is his first revocation since he was only released from

9  custody.

10     So he had a 36-month term imposed previously, and someone

11 can correct me if I'm wrong, but I believe he was remanded to

12 custody on November 12th, so that is approximately seven months

13 custody, so there should be 29 months supervision to follow.

14         **THE COURT:**  Okay.  So I'll impose that to run

15 concurrently with the supervised release in the new case and

16 under the same terms of supervised release as I mentioned

17 earlier.

18     Okay.  Anything else, Ms. Paisner?

19         **MS. PAISNER:**  Your Honor, I believe that's all from

20 the Government at this time.

21         **THE COURT:**  Ms. Mar, have I forgotten anything?

22         **THE PROBATION OFFICER:**  No, Your Honor.

23     What about the fine?  It will be waived?

24         **THE COURT:**  Yes.  I will impose no fine due to a lack

25 of ability to pay a fine.

1    **THE PROBATION OFFICER:**  Okay.  Thank you.

2    **THE COURT:**  Mr. Woodson, is there anything else?

3    **MR. WOODSON:**  I don't believe so, Your Honor.

4    **THE COURT:**  Okay.  So we'll be issuing a Judgment and

5    Commitment Order which will provide for release.

6    Ms. Mar, if you could check as soon as you can about an

7    RRC placement and let Mr. Green know if there is one, and if

8    not, that he should proceed directly to his grandmother's

9    house.  And I'm hoping perhaps that Mr. Green, Sr., can make

10   sure that he's -- that you find out when he's released from

11   Santa Rita and get him transported either to the RRC, if they

12   have a placement, or to his grandmother's house.

13   Can you do that, Mr. Green?

14   **MR. GREEN, SR.:**  Yes.  I sure can, as long as someone

15   lets me know.

16   **THE COURT:**  Yes.  Get in touch with Ms. Mar, the

17   Probation Officer, and then she can keep you up to date on

18   whether he's going to the RRC or to his grandmother's house and

19   what the release date is so that he can get there without

20   having any difficulties.

21   **MR. GREEN, SR.:**  Can she give me a phone number now

22   that I can reach her?

23   **THE PROBATION OFFICER:**  I will call you.  I believe I

24   have your number.

25   **MR. GREEN, SR.:**  (510) 472-1181.

1          **THE PROBATION OFFICER:**  Okay.  I will give you a call

2     after this hearing.

3          **MR. GREEN, SR.:**  Thank you.

4          **THE COURT:**  Thank you, everyone.  That will conclude

5     this matter.

6               (Proceedings adjourned at 2:16 p.m.)

1

2

3                    CERTIFICATE OF REPORTER

4         I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    Tuesday, September 29, 2020

8

9   *Pamela Batalo Hebel*

10  _____
    Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11  U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25